## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

AMPLIFY EDUCATION, INC.,

                Plaintiff/Counterclaim Defendant,

      v.

GREENWOOD PUBLISHING GROUP, INC.
d/b/a HEINEMANN,

              Defendant/Counterclaim Plaintiff.

Civil Action No. 1:13-cv-02687-LTS-RLE

## AMPLIFY'S OPENING CLAIM CONSTRUCTION BRIEF REGARDING THE DISPUTED CLAIM TERMS IN THE AMPLIFY PATENTS, U.S. PATENT NOS. 7,114,126 AND 7,568,160

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION.........................................................................................................1

II.     BACKGROUND .........................................................................................................2

        A.      The Patents-In-Suit ........................................................................................3

III.    LEGAL STANDARDS FOR CLAIM CONSTRUCTION ........................................4

IV.     ARGUMENT ...............................................................................................................6

        B.      "mobile computing device" ...........................................................................6

        C.      "ticker area" .................................................................................................10

        D.      "freehand area"............................................................................................13

        E.      "palette"........................................................................................................15

        F.      "notations area" ...........................................................................................17

V.      CONCLUSION ..........................................................................................................19

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*3M Innovative Properties Co. v. Avery Dennison Corp.,*
   350 F.3d at 1367, 1372 (Fed. Cir. 2003) ................................................................8

*Allergan, Inc. v. Apotex Inc.,*
   2014 WL 2579287 (Fed. Cir. June 10, 2014) ........................................................7

*Dealertrack v. Huber,*
   674 F.3d at 1315, 1327 (Fed. Cir. 2012) ...............................................................7

*Innova/Pure Water, Inc. v. Water Filtration Sys., Inc.,*
   381 F.3d 1111 (Fed. Cir. 2004) .............................................................................5

*Kara Tech. v. Stamps.com,*
   582 F.3d 1341 (Fed. Cir. 2009) .............................................................................9

*Markman v. Westview Instruments, Inc.,*
   517 U.S. 370 (1996) ...........................................................................................4, 7

*Philips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) .....................................................................5, 6, 7

*Tandon Corp. v. U.S. Intern. Trade Com'n,*
   831 F.2d 1017 (Fed. Cir. 1987) ...........................................................................18

*Thorner v. Sony Computer Entm't Am., LLC,*
   669 F.3d 1362, 1365 (Fed. Cir. 2012) ...................................................................7

*Vitronics Corp. v. Conceptronic, Inc.,*
   90 F.3d 1576, 1582 (Fed. Cir. 1996) .....................................................................5

*Yarway Corp. v. Eur-Control USA, Inc.,*
   775 F.2d 268 (Fed. Cir. 1985) .............................................................................13

**Other Authorities**

Local Patent Rule 11 ..................................................................................................1

## I.    INTRODUCTION

Pursuant to Paragraph 4 of the Court's Pre-Trial Scheduling Order No. 1 (Dkt. No. 18), Plaintiff-Counterclaim Defendant Amplify Education, Inc. ("Amplify") respectfully submits this Opening Claim Construction Brief on its asserted patents, United States Patent Nos. 7,114,126 ("the '126 Patent") and 7,568,160 ("the '160 Patent") (collectively "the Amplify Patents"). Amplify and Defendant-Counterclaim Plaintiff Greenwood Publishing Group, Inc. d/b/a Heinemann ("Heinemann") have met and conferred on the terms that require construction and, as stated in the parties' Joint Claim Terms Chart Pursuant to Local Patent Rule 11 ("Joint Chart") (Dkt. No. 41), propose five disputed terms between the two Amplify patents for the Court's construction.[1]

Amplify's proposed constructions are based on the intrinsic evidence and guided by the bedrock principles of claim construction.  In contrast, Heinemann's proposed constructions depart from the plain language of the claims, the intrinsic evidence, and attempt to improperly narrow the scope of the claim by importing limitations from embodiments.  As to the term "mobile computing device," for example, Amplify submits that its meaning is clear on its face and thus requires no construction, other than to reject Heinemann's clear attempt to read in limitations.  To the extent the Court finds that construction of this term is necessary, Amplify has proposed a construction that is consistent with the plain and ordinary meaning of the term, as well as the intrinsic evidence.  As to the remaining four disputed terms, Heinemann proposes constructions that require a "fixed area," which not only lacks any support in the intrinsic record, but also contradicts the plain language of the claims.

---

[1] Although there are six disputed terms between the two Amplify patents, one term, *viz.*, "mobile computing device," is a term that is used in both Amplify patents.  Therefore, there are five disputed terms in total for the '126 and '160 patents for the Court's construction.

In contrast to Heinemann's proposals, Amplify's constructions are consistent with the claim language and well-grounded in the intrinsic record. For the reasons set forth below, Amplify respectfully requests that this Court adopt its proposed constructions.

## II.    BACKGROUND

A pioneer in the educational assessment, intervention, and access space, Plaintiff Amplify Education, Inc. is committed to the research and development of groundbreaking technologies that enable educators across the country to drastically improve the way teachers teach and students learn.[2] Through the use of Amplify's products and services, educators are able to manage whole classrooms while offering more personalized instruction, enabling students to become active and engaged learners. Through the power of technology and data, teachers can assess student progress, respond to individual student needs and accelerate personalized learning in an efficient and dynamic manner. To date, Amplify has supported more than 200,000 educators and 3 million students across all 50 states.

Amplify markets a number of mobile classroom assessments products. One line of products, known as mCLASS, is comprised, in part, of observational reading assessment software for students in kindergarten through sixth grade. Compatible with most common mobile touch devices, such as the Apple iPad, the mCLASS line of products allow teachers to assess and analyze the ability and performance of each student in his or her class, and use the scores and other data collected to prescribe tasks, create lessons, and assign activities that target the student's reading and phonological needs.

---

[2] Prior to acquisition by News Corp. Inc. in 2012, Amplify was known as Wireless Generation, Inc., founded in 2000 in part by co-founder Lawrence J. Berger, the lead inventor of the Amplify Patents.

### A.        The Patents-In-Suit and Claimed Inventions

Amplify has asserted the '126 and '160 patents against Heinemann in this case.  Both are entitled "A System and Method for Real-Time Observational Assessment,"[3] and generally relate to educator-conducted assessments of students on mobile computing devices.  Ex. A,'126 patent, Abstract; Ex. B, '160 patent, Abstract.  The application for the '126 patent was filed by inventor Lawrence J. Berger *et al.* on July 18, 2002, following the filing of provisional application No. 60/305,887, filed on July 18, 2001.  Ex. A, '126 patent, col. 1:4-7.  The application for the '160 patent was also filed by inventor Lawrence J. Berger *et al*. on February 8, 2006 as a continuation of the '126 patent, and thus the '126 and '160 patents share a common specification.  The patents were assigned to Wireless Generation, Inc., now operating as Amplify.

The '126 patent generally covers a system, method, and computer program product designed for an educator to conduct real-time observational assessments of a student using a mobile computing device.  Ex. A,'126 patent, Abstract.  Complementing the claimed invention of the '126 patent, the '160 patent generally covers techniques designed for an educator to conduct real-time observational assessments of a student using a mobile device.  Ex. B,'160 patent, Abstract.  The observational assessment system covered by the Amplify patents is comprised of a device running a number of educational assessment applications, distributed and downloaded from a Web-based platform where reporting and data management is available to the educator.  Ex. A,'126 patent, Abstract.  Educators can periodically sync completed assessment data, diagnostic results, and notes to the Web-based platform for additional reporting and functionality.  *Id*.

---

[3] A copy of the '126 patent and the '160 patent are attached as Exhibit A and B, respectively.

Importantly, during assessment and while the student is reading a selected text, the educator can record student reading errors through use of a variety of coding buttons, as well as create notes via an area on the screen:



Ex. A, '126 Patent, Figure 4I.  After assessment is complete, the teacher can further analyze the errors by coding each with the information the student used in making the error (e.g., Meaning, Syntax, or Visual).  Ex. A, '126 Patent, Figure 4H.

Using such a system allows for real-time observational assessment while providing the added advantages of, among other things, reducing paperwork, allowing for the standardization of data capture, providing immediate analysis and calculation of key statistics, streamlined reporting of results, and generating class wide progress reports.  *See* Ex. A, '126 patent, col. 2:14-15, 50-51, 56-57, 65-66 & col. 3:13-14.

## III.    LEGAL STANDARDS FOR CLAIM CONSTRUCTION

Claim construction is a question of law exclusively within the province of the court. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372 (1996).  The claim construction

process begins with the plain language of the claims, since "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Philips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citations omitted).  This process requires an inquiry into the meaning a particular claim would have had to a person having ordinary skill in the art in question at the time of invention.  *See id.,* 415 F.3d at 1312-13; *Innova/Pure Water, Inc. v. Water Filtration Sys., Inc.,* 381 F.3d 1111, 1116 (Fed. Cir. 2004).  Such a person "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Philips,* 415 F.3d at 1313.

In some cases, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent . . . and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.  In other cases, such a construction may be less evident, or the intrinsic record requires an alternative construction.  The Federal Circuit has instructed that "the specification is always highly relevant to the claim construction analysis.  Usually it is dispositive; it is the single best guide to the meaning of a disputed term."  *Id.* at 1315 (internal quotations omitted)."  For that reason, claims "must be read in view of the specification, of which they are a part."  *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  The inquiry cannot be what a particular word means in the abstract or what the particular phrase means generally, but rather what the word or phrase means in the context of a particular patent and its particular specification.  *Id.* at 1321,1313.  The Federal Circuit has cautioned, however, that care must be exercised "to avoid the danger of reading [undue] limitations from the specification into the claim."  *Id.* at 1323.

This court must also consider the "patent's prosecution history, if it is in evidence" in construing patent claims. *Id.* at 1315 (citations omitted). The prosecution history, combined with the specification, comprise the "intrinsic evidence," the primary source of evidence of what the patentee meant and represented to the U.S. Patent & Trademark Office in using the selected claim language. *Id.* at 1317. Additionally, although district courts may rely on so-called "extrinsic evidence" in the claim construction process (*e.g.,* expert and inventor testimony, dictionaries, and learned treatises), the Federal Circuit has cautioned that such evidence is "less significant" and "less reliable" than the intrinsic record for claim construction. *Philips*, 415 F.3d at 1317-18 (quotation marks omitted).

## IV.   ARGUMENT

### B.   "mobile computing device"

| Amplify's Construction | Heinemann's Construction |
|---|---|
| No construction necessary.<br>In the event the Court decides that construction of this term is necessary: Plain and ordinary meaning, which is handheld computers, portable computing devices, personal digital assistants (PDAs) and the like | Handheld device that does not create a physical barrier between teacher and student, such as a personal digital assistant (PDA) |

The term "mobile computing device" is recited in all asserted independent claims of the '126 and '160 patents.[4] This term is well understood, and neither the patent nor the file history justify deviating from the term's plain and ordinary meaning. That meaning is clear: a "mobile computing device" means "handheld computers, portable computing devices, personal digital assistants (PDAs) and the like."

In construing a claim term, the Court must look at the term's plain and ordinary meaning

---

[4] Because the '126 patent and '160 patent are related and share the same specification, the term "mobile computing device," which appears in the claims of both patents, ought to have the same construction.

as understood by a person of ordinary skill in the art.  *Allergan, Inc. v. Apotex Inc.*, 2014 WL

2579287, at *2 (Fed. Cir. June 10, 2014) (citing *Philips*, 415 F.3d at 1313).  Two exceptions

exist to this general rule, namely, when a patentee acts as her own lexicographer or disavows

claim scope.  *Id.* (citing *Thorner v. Sony Computer Entm't Am.*, LLC, 669 F.3d 1362, 1365 (Fed.

Cir. 2012)).  Neither exception applies here as the intrinsic evidence clearly demonstrates that the

patentee did not set out a special definition for "mobile computing device" in the Amplify

patents.

    The plain meaning is consistent with the claims and supported by the specification and

prosecution history.  In the specification, mobile computing device is clearly used to describe a

group of devices of which handheld computers and PDAs, for example, are a subset.  *See* Ex. A,

'126 patent, col. 2:23-29; Ex. B, '160 patent, col. 2:30-33 (referencing PDA as type of mobile

computing device).  Moreover, in describing the claimed invention in the Summary of the

Invention, the specification explains that the system is intended to run on a variety of mobile

computing devices, such as "handheld computers, portable computing devices, personal digital

assistants (PDAs) and the like."  *See* Ex. A, '126 Patent, col. 2:22-26; Ex. B, '160 Patent, col.

2:30-33.  Indeed, the specification indicates that the patentee used "mobile computing device" in

a manner that is consistent with its plain and ordinary meaning.

    In contrast, Heinemann argues that "mobile computing device" should be construed as

"handheld device that does not create a physical barrier between teacher and student, such as a

personal digital assistant (PDA)."  Heinemann's construction is flawed as it appears to rely on

the specification to read limitations into the claim in direct violation of well-established claim

construction law.  *See*, *e.g.*, *Markman*, 52 F.3d at 980, *aff'd*, 517 U.S. 370 (1996); *Dealertrack

v. Huber,* 674 F.3d at 1315, 1327 (Fed. Cir. 2012).  ("As a general rule, it is improper to read

limitations from a preferred embodiment described in the specification"); *3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d at 1367, 1372 (Fed. Cir. 2003). ("Limitations from the specification, however, cannot be imported into the claims, and this rule must be strictly enforced"). In offering its construction, Heinemann attempts to incorporate two limitations into the term's construction, namely, "handheld device" and "does not create a physical barrier between teacher and student," neither of which finds support in the intrinsic evidence. Indeed, the record supports a broader construction consistent with that proposed by Amplify.

With regard to the "handheld device" limitation, the specification and prosecution history make clear that "handheld device" is *one example* of a mobile computing device and was not intended to be the universe of mobile computing devices. The intrinsic record provides that "[t]he system of the present invention consists of an array of instructional applications designed to run on **handheld computers, portable computing devices, personal digital assistants (PDAs) and the like**." Ex. A, '126 patent at 2:23-29; Ex. B, '160 patent at 2:30-33 (emphasis added). Moreover, provisional application No. 60/305,887 (to which the '126 and '160 patents claim priority) similarly makes clear that the patentee did not intend to limit its invention to handheld devices: "The Wireless Generation application set consists of an array of instructional applications designed to run on *handhelds and portable computing devices*." Ex. C, Provisional App. No. 60/305,887, at 16) (emphasis added).

Indeed, although Figure 1 of the '126 and '160 patents includes element 102, which the specification refers to as "handheld device 102" or "PDA 102," *see, e.g.* '126 patent, col. 8:53 ("An additional application on handheld device 102…"); *see also id.*, col. 5:12 ("PDA 102 is linked, either via a serial or universal serial bus (USB) connection, to a workstation 106…"); *see also* '160 patent, col. 8:43-44; 5:10-11, the specification expressly states that Figure 1 merely

illustrates one embodiment of the invention: "FIG. 1 is a block diagram illustrating the system architecture of an embodiment of the present invention, showing connectivity among the various components."  Ex. A, '126 patent, col. 3:49-51; Ex. B, '160 patent, col. 3:53-55 (emphasis added).

It is axiomatic that claim scope should not be limited to a preferred embodiment of the invention. *Kara Tech. v. Stamps.com*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.").  Moreover, the specification unequivocally states that "it will be apparent to one skilled in the relevant art(s) how to implement the following invention in alternative embodiments … utilizing *other mobile computing devices other than a PDA*[]."  Ex. A, '126 patent at 4:48-55; Ex. B, '160 patent at 48-54) (emphasis added).  Thus, the patentee did not disavow any claim scope with regard to "mobile computing device" and Heinemann's attempt to limit the construction in this manner is improper.

As to the limitation "does not create a physical barrier between teacher and student" that is included in Heinemann's proposed construction, there similarly is no basis whatsoever to import such a limitation into the construction for mobile computing device.  While the specification contains a passing reference to the absence of a physical barrier, *see* Ex. A, '126 Patent, col. 3:27-32 & Ex. B, '160 patent, col. 3:32-37, such reference was made in the context of describing one of several advantages of the invention, and not in the context of defining a mobile computing device.

Given the absence of any indication in the intrinsic record that the patentee intended to deviate from the plain and ordinary meaning of the term "mobile computing device," it is clear

that the claimed "mobile computing device" could include various types of devices, such as "handheld computers, portable computing devices, personal digital assistants (PDAs) and the like," and without any limitation regarding physical barriers, in accordance with the ordinary meaning of this term.  Ex. A, '126 patent, col. 2:23-29; Ex. B, '160 patent, col. 2:30-33.

Accordingly, this Court should adopt Amplify's position with regard to "mobile computing device."

### C.   "ticker area"

| Amplify's Construction | Heinemann's Construction |
| --- | --- |
| area on a screen that displays content | a fixed area on the mobile computing device for displaying text |

The parties dispute the construction for the term "ticker area," which is recited in asserted independent claims 1 and 15 of the '126 patent.  Amplify's proposed construction is supported by the claims and the intrinsic record.  The claimed "ticker area" is an area on a screen. Independent claims 1 and 15 recite that the "ticker area" is "***on a first screen*** displayed on the mobile computing device."  Ex. A, '126 patent, claims 1, 15 (emphasis added).  This is supported by the specification, where Figure 4C shows ticker area 432 that is included in "screen shot 430 displayed on PDA 102 during the administration of the literacy assessment."  *Id*., col. 12:49-51. The claimed "ticker area" is also an area that displays content.  Independent claims 1 and 15 recite that "at least a portion of the content that is made perceivable to the assessed student is displayed in the ticker area."  *Id*., claims 1, 15.  This is also supported by the specification, where "[t]icker area 432 sequentially displays a pre-determined number of words from the text of the book selected in screen 420."  *Id*., col. 12:58-61.

Heinemann's proposed construction, however, is contrary to the language of the claims of the '126 patent and is unsupported by the intrinsic record.

10

*First*, there is no support for Heinemann's inclusion of the phrase "fixed area" in its proposed construction of this term.  The word "fixed" does not appear anywhere in the specification of the '126 or '160 patent, does not appear anywhere in the claims of the '126 and '160 patents, and appears only once in the prosecution history of the '126 patent with regard to a "fixed workstation," which has nothing to do with the ticker area.  Ex. D, Apr. 3, 2006 Notice of Allowance ('126 patent), at 2.

In fact, Heinemann's proposed construction is in direct contradiction with the claim language.  The claims clearly express that the "ticker area" is not an area that is "fixed … on the mobile computing device," but rather an area that is *displayed* on the *screen* of the mobile computing device.  *See* Ex. A, '126 patent, at claims 1, 15 ("a ticker area ***on a first screen displayed*** on the mobile computing device") (emphasis added).

Nothing in the intrinsic record supports Heinemann's position that the "ticker area" is "a fixed area on the mobile computing device."  The claim language and specification contradict Heinemann's position because they make clear that the "ticker area" is *displayed* on a screen at certain times and is *not* displayed permanently, nor is it a fixed area on the device.  The figures themselves further contradict Heinemann's position.  Figure 4C, reproduced below, represents a "screen shot 430 displayed on PDA 102 during the administration of the literacy assessment" and includes "a ticker area 432."  Ex. A, '126 patent, at 12:49-55.



**FIG. 4C**

Figure 4G, reproduced below, displays another screenshot (screenshot 470 below) on the same device under different circumstances.  This screen does not include the ticker area 432, thus indicating that the ticker area 432 is not fixed as Heinemann proposes.



**FIG. 4G**

*Second*, Heinemann's proposal to limit "ticker area" to "displaying text" is too narrow and contrary to the language of the claims.  Independent claim 1 recites "storing content" and "providing a ticker area … where in at least a portion of ***the content*** … is displayed in the ticker area."  Ex. A, '126 patent, claim 1 (emphasis added).  Similarly, independent claim 15 also recites "a ticker area … wherein at least a portion of ***the content*** … is displayed in the ticker area."  *Id.* at claim 15 (emphasis added).  Dependent claims 9 (dependent from claim 1) and 24 (dependent from claim 15) narrow the "content" limitation to "text."  *See* Ex. A, '126 patent,

12

claims 9, 24.  Heinemann's attempt to narrow the scope of the independent claims displaying only text in the "ticker area" violates the principle of claim differentiation because it would result in independent claims 1 and 15 having the same scope as their corresponding dependent claims 9 and 24.  *See Yarway Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268 (Fed. Cir. 1985) ("where some claims are broad and others narrow, the narrow claim limitations cannot be read into the broad whether to avoid invalidity or to escape infringement") (internal quotation marks omitted).  Although the specification discusses the ticker area 432 displaying text, this discussion is in the context of one embodiment of the invention.  Ex. A, '126 patent, col. 12:25-29 ("Thus, an embodiment of the present invention allows a service provider organization to provide a platform that allows real-time observation literacy assessment based on the running record methodology described in Clay.  Such an embodiment is now described in more detail.")

For the reasons articulated above, the term "ticker area" should be construed to mean "area on a screen that displays content" and Heinemann's proposed construction, which is unsupported by the intrinsic record and violates the doctrine of claim differentiation, should be rejected.

### D.      "freehand area"

| Amplify's Construction | Heinemann's Construction |
|---|---|
| area on a screen to make a written note | a fixed area on the mobile computing device display for handwriting text |

The term "freehand area" is recited in asserted independent claims 1, 15, and 29 of the '126 patent.  Amplify's proposed construction is supported by the claims and the intrinsic record.  Consistent with the plain language of the claims, the claimed "freehand area" is an area on a screen.  Indeed, independent claims 1 and 15 recite that the "freehand area" is "***on the first screen***."  Ex. A, '126 patent, at claims 1, 15 (emphasis added).  This is supported by the

specification, where Figure 4C shows freehand area 438 that is included in "screen shot 430 displayed on PDA 102 during the administration of the literacy assessment." *Id.,* col. 12:49-51. The claimed "freehand area" is also an area to make a written note.  Independent claims 1 and 15 recite "a freehand area … wherein the teacher may create a note." *Id.*, claims 1, 15.  Independent claim 29 also recites "providing a freehand area … to enable the teacher to enter a note." *Id.,* claim 29.  Making a "written note" is further supported by the specification: "Freehand area 438 may then be used by the teacher to make a note about the error (e.g., writing the word the student mistakenly substituted for the highlighted word actually in the book's text).  In an embodiment, these notes are taken in freehand thereby eliminating the need to use Graffiti." *Id*., col. 13:17-22.

Amplify's construction is further supported by the prosecution history.  During prosecution of the '126 patent, applicant explained in response to an Office Action that the claimed method includes, *inter alia*, "providing a ***freehand area*** on the first screen ***where the teacher may create a note*** relating to an observable behavior."  Ex. E, Appl. 10/197,482, Nov. 7, 2005 Resp. to Office Action at 14 (emphases added); *see also id*. at 17 ("Second, Sunburst does not describe or suggest providing a *freehand area* on the first screen where the teacher *may create a note* relating to an observable behavior.") (emphasis added); *see also id*. at 20 ("The method also includes providing a *freehand area* on the mobile computing device to enable the teacher *to enter a note* related to a[] behavior observed during the literacy assessment.").  As such, the freehand area is an area on a screen to make a written note.

Heinemann's proposed construction, in contrast, contradicts the language of the claims of the '126 patent and is unsupported by the intrinsic record.  Similar to its proposed construction of "ticker area," Heinemann attempts to construe "freehand area" as a "fixed area on the mobile computing device display."  But as with "ticker area," there is no support for this construction in

14

the intrinsic record.  The word "fixed" does not appear anywhere in the claims or specification, and appears only once in an unrelated context in the prosecution history of the '126 patent.  *See, supra* Section IV.B.

Furthermore, as with ticker area, the claims and specification contradict Heinemann's position because they make clear that the "freehand area" is displayed on a screen at certain times and is not displayed permanently nor is it a fixed area on the device.  *Id*.  Independent claims 1 and 15 recite a "first screen *displayed* on the mobile computing device" and "a freehand area *on the first screen*."  Ex. A, '126 patent, claims 1, 15 (emphasis added); *see also supra* Section IV.B.  The figures of the patent also contradict Heinemann's position, making it clear that the freehand area 438 is displayed on a screen only in certain circumstances, and thus is not fixed, and that the contents displayed on the screen change.  *See, supra* Section IV.B.

Moreover, Heinemann's proposed construction of "freehand area" as an area "for handwriting text" is an attempt to impermissibly narrow the scope of this term.  A "note" is a broad term that may include text but is not necessarily limited to only text.  The specification makes clear that entering text into the freehand area is just one example of making a note.  *See* Ex. A, '126 patent, col. 13:17-20 ("Freehand area 438 may then be used by the teacher to make a note about the error (*e.g.,* writing **the word** the student mistakenly substituted for the highlighted word actually in the book's text).") (emphasis added).

Thus, for the reasons articulated above, the term "freehand area" should be construed to mean "area on a screen to make a written note."

### E. "palette"

| Amplify's Construction | Heinemann's Construction |
| --- | --- |
| area on a screen that includes buttons | a fixed area on the mobile computing device display for displaying buttons |

15

The term "palette" is recited in asserted independent claims 1 and 15 of the '126 patent. Amplify's proposed construction is supported by the claims and the intrinsic record. The claim language itself indicates that "palette" is an area on a screen. Indeed, independent claims 1 and 15 recite that the "first palette" is "***on the first screen***." Ex. A, '126 patent, claims 1, 15 (emphasis added). This is further supported by the specification, where Figure 4C shows freehand area 438 that is included in "screen shot 430 displayed on PDA 102 during the administration of the literacy assessment." *Id*., col. 12:49-51. In addition, the claimed "palette" is also an area that includes buttons. Independent claims 1 and 15 recite "providing a plurality of buttons on the first palette." *Id*., claims 1, 15.

The parties appear to agree that the "palette" includes or displays buttons. But, Heinemann's attempt to construe "palette" as "a fixed area on the mobile computing device display" is unsupported by the intrinsic record. As with "ticker area," there is no support for this requirement in the intrinsic record. The word "fixed" does not appear anywhere in the claims or specification, and appears only once in an unrelated context in the prosecution history of the '126 patent. *See, supra* Section IV.B. Furthermore, the claims and specification contradict Heinemann's position because they make clear that the "palette" is displayed on a screen at certain times and is not a fixed area on the device. *See, supra* Section IV.B. Independent claims 1 and 15 recite a "first palette *on the first screen*." Ex. A, '126 patent, claims 1, 15 (emphasis added); *see also supra* Section IV.B. The figures of the patent also contradict Heinemann's position, making it clear that the palette of code buttons 434a-f is displayed on a screen only in certain circumstances, and thus is not fixed, and that the contents displayed on the screen change. *Id*, col. 12:49-55; *see also, supra* Section IV.B.

Accordingly, the term "palette" should be construed to mean "area on a screen that

includes buttons" and Heinemann's proposed construction should be rejected.

      **F.**    **"notations area"**

| Amplify's Construction | Heinemann's Construction |
|---|---|
| area on a screen to make a note | a fixed area on the mobile computing device display for handwriting text |

      Lastly, the parties dispute the construction of the term "notations area," which is recited in asserted dependent claims 4, 13, and 22 of the '160 patent. Amplify's proposed construction is supported by the claims and the intrinsic record. The claim language itself indicates that "notations area" is an area on a screen. Indeed, Claims 4, 13, and 22 recite that the "notations area" is "***on the display*** of the mobile computing device." Ex. B, '160 patent, claims 4, 13, 22 (emphasis added). The claimed "display" of the mobile computing device is the screen, where the stored content, icons, and visual indication of error behaviors are displayed. *Id*., claims 1, 10 & 19. "Notations area" is also an area to make a note. Claims 4, 13, and 22 recite "a notations area being configured to receive a note from the teacher" and "receiving, from the teacher, a note in the notations area." *Id*., claims 4, 13, 22.

      Heinemann's proposed construction is contrary to the language of the claims of the '160 patent and unsupported by the intrinsic record. Heinemann again attempts to impermissibly narrow the scope of the claim by including the requirement that the area is "fixed." As with "ticker area," there is no support for this construction in the intrinsic record. The word "fixed" does not appear anywhere in the claims or specification, and appears only once in an unrelated context in the prosecution history of the '126 patent. *See, supra* Section IV.B. Furthermore, as with "ticker area," the claims and specification contradict Heinemann's position because they make clear that the "notations area" is displayed on a screen at certain times and is not displayed permanently nor is it a fixed area on the device. *See, supra* Section IV.B. Claims 4, 13, and 22

17

in fact recite a "a notations area *on the display* of the mobile computing device."  Ex. B. '160 patent, claims 4, 13, 22 (emphasis added); *see also supra* Section IV.B.  The figures of the patent also contradict Heinemann's position, making clear that the "notations area" is displayed on a screen only in certain circumstances, and thus is not fixed, and that the contents displayed on the screen change.  *See, supra* Section IV.B.

Heinemann's proposed construction of "notations area" as an area "for handwriting text" is yet another an attempt to narrow the scope of this term without any basis for doing so.  For the same reasons set forth above with respect to "freehand area," Heinemann's attempt to narrow the term "notations area" to an area "for . . . text" is unsupported in light of the broad meaning of the term "note" and the specification which explains that "text" is just one example of making a note.  *See* Ex. A, '126 patent, col. 13:17-20; *see also supra* Section IV.C.

Moreover, Heinemann's attempt to narrow "notations area" to an area for "handwriting" is similarly unsupported.  Indeed, Heinemann proposes identical constructions for the "freehand area" and "notations area" terms, despite the well-settled principal that different terms carry different meanings.  *Tandon Corp. v. U.S. Intern. Trade Com'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims.").  Thus, despite the fact the terms appear in separate, but related, patents, the terms "notations area" and "freehand area" should not be construed identically.  Indeed, the specification shows that unlike "freehand," the term "notations" does not imply a particular input method, such as handwriting.  The specification further makes clear that "freehand" input is simply one embodiment: "[i]n *an embodiment*, these notes are taken in freehand thereby eliminating the need to use Graffiti."  *Id*. at 13:20-22 (emphasis added).  As such, requiring handwriting for the "notations area" improperly ignores the distinction between

18

the terms "notations area" and "freehand area."

Accordingly, the term "notations area" should be construed to mean "area on a screen to make a note" and Heinemann's proposed construction should be rejected.

## V.    CONCLUSION

For the foregoing reasons, Amplify respectfully requests that this Court adopt its proposed constructions.

Dated: June 19, 2014                    Respectfully submitted,


                                        FISH & RICHARDSON P.C.


                               By:    */s/ Karolina Jesien*
                                      Karolina Jesien, Esq.  (KJ 7292)
                                      Tal Kedem, Esq. (*Admitted Pro Hac Vice*)
                                      601 Lexington Avenue
                                      52nd Floor
                                      New York, NY 10022
                                      Telephone: (212) 765-5070
                                      Facsimile: (212) 258-2291
                                      jesien@fr.com
                                      kedem@fr.com


                                      Ruffin Cordell, Esq. (*Admitted Pro Hac Vice*)
                                      Indranil Mukerji, Esq. (*Admitted Pro Hac Vice*)
                                      Cherylyn E. Mizzo, Esq. (*Admitted Pro Hac Vice*)
                                      1425 K Street, N.W.
                                      11th Floor
                                      Washington, DC 20005-3682
                                      Telephone: (202) 783-5070
                                      Facsimile: (202) 783-2331
                                      cordell@fr.com
                                      mukerji@fr.com
                                      mizzo@fr.com
                                      Attorneys for Plaintiff
                                      AMPLIFY EDUCATION, INC.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served June 19, 2014, via the Court's ECF system upon all counsel designated to receive such notices.

*/s/ Lina Tessitore*
Lina Tessitore